13 A.3d 801

Octavian ALLEN

v.

STATE of Maryland.

Drew W. Smith

v.

State of Maryland.

Nos. 1963, 1968, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 4, 2011.

310

Brian J. Fleming (Williams & Connolly, LLP, on the brief), Washington, D.C., for appellant.

Edward J. Kelley (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for Appellee.

Panel: WRIGHT, GRAEFF, ARRIE W. DAVIS, (Retired, Specially Assigned), JJ.

GRAEFF, J.

On October 2, 2009, in the Circuit Court for Baltimore City, Octavian Allen and Drew W. Smith, appellants, were convicted of distribution of cocaine pursuant to an agreed statement of facts. Both appellants were sentenced to six years imprisonment.

In this consolidated appeal, appellants present two questions for our review, which we quote:

1. Did the suppression court err in concluding that the warrantless searches of Mr. Allen and Mr. Smith were reasonable under the Fourth Amendment when the police took no steps to protect their personal privacy, their clothing was manipulated to expose private areas of their bodies, and the searches were conducted on a public street in a residential area in the presence of individuals other than the searching officers and in the absence of any exigency?

2. Did the suppression court err in concluding that the warrantless arrest of Mr. Smith was supported by probable cause?

For the reasons set forth below, we shall affirm the judgment of the circuit court.

## FACTUAL AND PROCEDURAL BACKGROUND

### Suppression Hearing

On April 23, 2009, the court held a hearing on appellants' motion to suppress drugs found on their persons. Detective Willie E. Farrar, Jr., a Baltimore City Police Officer, testified as an "expert in the sale, identification, [use], and distribution"

of street-level drugs. On March 27, 2008, he was patrolling the 100 block of North Clinton Street, a "popular place to buy narcotics." At approximately 8:00 p.m., he observed a group of males, including Mr. Allen and Mr. Smith, standing at the corner of Esther Place and Clinton Street. As cars passed by, the men shouted: "We got the fat 20's here." Detective Farrar testified that, based on his training and experience, he understood "fat 20's" to be a term used to refer to $20 worth of cocaine. When a car would pull up, "the whole group would just bum rush the cars."

A truck pulled up to the men. Detective Farrar observed Mr. Allen approach the truck and engage the driver in a brief conversation. Mr. Allen was accompanied by other men, including Mr. Smith, who Detective Farrar previously had arrested for drug distribution on the same block. The driver gave Mr. Allen money, and Mr. Allen then "removed small objects from his sleeve area and handed [them] to the driver." Believing that the group was participating in narcotics sales, Detective Farrar called an arrest team to stop the truck and arrest the group of men.

Detective James Beal, one of the officers on the arrest team, testified that Detective Farrar issued a radio alert requesting assistance in arresting a group of males suspected of participating in a drug transaction. Although Detective Beal could not recall the details of Detective Farrar's description of the men, he said that Detective Farrar did give a description, and Mr. Allen matched that description. Detective Beal approached Mr. Allen, who was standing "alongside some parked cars near a garage on Esther Place," and placed him under arrest. There were no residential houses on the block, only garages that were closed.

Detective Beal then conducted a search incident to arrest. He first searched Mr. Allen's pockets and pant legs, and then he checked for "slits in the waistband area of his pants," but he did not find any narcotics. Detective Beal then pulled back Mr. Allen's pants and saw a plastic bag "protruding" from between his buttocks. While holding the waistband of Mr.

Allen's pants out, Officer Beal directed Mr. Allen to "spread his legs and squat." A bag dropped from between Mr. Allen's buttocks to "his underwear area," and Officer Beal "reached in and pulled it out." The bag contained 28 orange ziploc bags filled with narcotics. Officer Beal testified that he did not touch Mr. Allen while recovering the narcotics, and the only people present during the search were six or seven police officers. Officer Beal stood "right behind" Mr. Allen when the search of Mr. Allen's pants was conducted, and he testified that "no one" else could have observed Mr. Allen's buttocks.

Detective Andrew Wiman, who conducted the search of Mr. Smith, similarly testified that he received a directive from Detective Farrar to assist in the arrest of a group of men. Detective Wiman approached Mr. Smith, and he asked if Mr. Smith had "anything illegal on him." Mr. Smith responded that he had "some weed," meaning marijuana. Detective Wiman recovered marijuana from Mr. Smith's coat pocket and arrested him.

In his search of Mr. Smith incident to arrest, Detective Wiman pulled back the waistband of Mr. Smith's pants and saw "a plastic baggy kind of coming up through ... his cheeks." The bag was "kind of half concealed" in Mr. Smith's buttocks area. Detective Wiman then "reached down and pulled it out." The bag contained 24 ziploc bags filled with narcotics.

Detective Wiman described the location in which the search took place, testifying that there were a series of storage garages on one half of the block, which was divided by a wide alley, and residential homes on the other side of the block. The search was conducted near the storage garages. Detective Wiman testified that there were "no civilians in the area," and that no one, including the other officers present, could have observed Mr. Smith's buttocks.

After the State called its last witness, Mr. Allen testified on his own behalf. He stated that, as he walked down Esther Place between 8:00 p.m. and 8:30 p.m. on March 27, 2008, he was approached by the police and subsequently searched. His

description of the search differed from Detective Beal's testimony. He testified that Officer Beal unbuckled his belt and put a flashlight "down in the front part of [his] boxers." Mr. Allen testified that he had hidden drugs between his buttocks, but he stated that they were located "closer to [his] penis area," suggesting that the drugs would not have been visible from looking down his pants. When Officer Beal directed him to "drop and squat," his pants and underpants were "down by his knees," and his penis and buttocks were exposed. He testified that he was searched in front of the Royal Farms' parking lot, where he had been "hanging out," and when he was searched, he was able to see customers entering and exiting the store.

Mr. Smith was the last witness. He denied that he had shouted "fat 20's." He testified that he was walking down Esther Place toward Highland Avenue when "police cars swarmed in front of [him]." The police approached him, and Officer Wiman searched him. He stated that Detective Wiman "recovered some marijuana from out of [his] pocket" and then pulled his pants and underwear down to his knees, exposing his genital area. According to Mr. Smith, Detective Wiman bent him over and then recovered the drugs from between Mr. Smith's buttocks. Detective Wiman then pulled up Mr. Smith's pants, set Mr. Smith on the ground, and removed Mr. Smith's boots. Mr. Smith stated that three other individuals were being searched in the immediate vicinity.

In resolving the disputed testimony, the court found the testimony of the police officers to be credible, specifically finding as a fact that no one but the officers conducting the searches could see inside appellants' pants. It found that, with respect to each appellant, his "genitalia [was] not exposed, his anus [was not] exposed," and the officer merely "reached in" appellant's pants with "no manipulation." With respect to Mr. Smith's claim that the police lacked probable cause to arrest him, the court found that, at the very least, the police had reasonable suspicion of illegal drug activity to

support a *Terry*[1] stop, and once Mr. Smith admitted that he had marijuana in his coat pocket, the police had probable cause to arrest him. The court denied appellants' motions to suppress.

## Trial Proceedings

On October 2, 2009, appellants pled guilty pursuant to the following agreed upon statement of facts:

On March 27th, 2008, at approximately 8:00 p.m., officers were in covert [sic] observing the 100 block of North Clinton Street. Officers observed a group of at least eight males in the block that would attempt to flag down vehicles and yell that they had "fat 20's" as cars passed by, "fat 20's" being a street term for 20 dollars' worth of CDS. At approximately 8:20 p.m., officers observed a Chevy truck enter the block. The driver of the vehicle was later identified as Ray Collier. Several of the males flagged down Collier's truck. Octavian Allen approached the driver's side of the vehicle and engaged in a brief conversation. Collier then handed Allen U.S. currency. Allen then reached into his left sleeve and removed suspected CDS and handed it to Collier. Collier then left the area. Collier was stopped by officers, and upon the officers' approach, had swallowed the suspected CDS. The arrest team then approached the group of males. As the officers approached, Darien Johnson dropped two clear zips and four zips of cocaine on to the ground. Said cocaine was recovered and Johnson was arrested. Octavian Allen was also arrested and search incident to arrest of Octavian Allen was 28 orange zips of cocaine recovered from Allen's buttocks area. Officers asked Drew Smith if he had anything illegal and Smith advised that he only had some weed in his coat pocket, which officers at the time recovered one jug of marijuana. Smith was then arrested. Search incident to arrest of Drew Smith recovered from Smith's buttocks area was one plastic bag containing cocaine, one pink and 23 yellow zips of cocaine.

---

1. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

All events occurred in the City of Baltimore, State of Maryland.

The State then introduced into evidence a chemical analysis report, which concluded that the substances found on appellants' persons were cocaine. The court found appellants guilty of distribution of cocaine.

This timely appeal followed.

## DISCUSSION

### I.

Appellants contend that the circuit court erred in denying their motions to suppress the drugs found on their persons when they were searched incident to arrest. Two grounds of error are asserted: (1) appellant Smith argues that the police did not have probable cause to arrest him; and (2) both appellants argue that the searches incident to their arrests, which they characterize as strip searches in a public place, were not reasonable under the Fourth Amendment.

"When we review a trial court's grant or denial of a motion to suppress evidence alleged to have been seized in contravention of the Fourth Amendment, we view the evidence adduced at the suppression hearing, and the inferences fairly deducible therefrom, in the light most favorable to the party that prevailed on the motion." *Williamson v. State,* 413 Md. 521, 531–32, 993 A.2d 626, *cert. denied,* —— U.S. ——, 131 S.Ct. 419, 178 L.Ed.2d 327 (2010). We "defer[ ] to the trial court's fact-finding at the suppression hearing, unless the trial court's findings were clearly erroneous." *Bailey v. State,* 412 Md. 349, 362, 987 A.2d 72 (2010). In determining whether the searches and seizures at issue were legal under the Fourth Amendment, however, "we 'make our own independent constitutional appraisal by reviewing the law and applying it to the facts of the case.' " *Crosby v. State,* 408 Md. 490, 505, 970 A.2d 894 (2009) (quoting *State v. Williams,* 401 Md. 676, 678, 934 A.2d 38 (2007)). *Accord Bailey,* 412 Md. at 362, 987 A.2d 72.

We will address each of appellants' contentions in light of the applicable standard of review.

## A. Probable Cause to Arrest

Appellant Smith contends that "there was no particularized probable cause to arrest" him. He argues that, although he was part of the group on the corner, there was no evidence that he personally engaged in any drug-related activity. Mr. Smith asserts that Detective Farrar "could not discern whether Mr. Smith was actually flagging down cars or yelling to advertise the availability of drugs," and that Detective Farrar did not see him engage in any drug transaction. He argues that, without any particularized observations of criminal activity by Mr. Smith, "probable cause to arrest Mr. Smith for suspected drug-related crimes was lacking."

The State responds in two ways. First, it argues that the police had probable cause to arrest Mr. Smith, noting that "Detective Farrar, an expert in street-level drug sales, testified that he observed a group of individuals, one of whom was [Mr.] Smith, engaged in the criminal enterprise of selling narcotics in an area known for illegal drug activity," and that he identified Mr. Smith as one of the individuals yelling, "[w]e have fat 20's," while attempting to flag down cars. This observation, the State asserts, along with the fact that Detective Farrar had arrested Mr. Smith "in the same block one month earlier for narcotics distribution," established probable cause to arrest Mr. Smith.

Second, the State argues that, even if Detective Farrar's observations did not establish probable cause to arrest, Mr. Smith's actions when he was approached by Detective Wiman provided the requisite probable cause. When Detective Wiman approached Mr. Smith, he asked if Mr. Smith was in possession of anything illegal. The State contends that Mr. Smith's response, that he had marijuana in his coat pocket, provided probable cause to arrest.

The Fourth Amendment to the United States Constitution, applicable to the States through the Fourteenth

Amendment, protects individuals from unreasonable searches and seizures. *Williamson,* 413 Md. at 534, 993 A.2d 626. "A warrantless arrest made in a public place is not unreasonable, and accordingly does not violate the Fourth Amendment, if there is probable cause to believe that the individual has committed either a felony or a misdemeanor in an officer's presence." *Donaldson v. State,* 416 Md. 467, 480, 7 A.3d 84 (2010).

This Court recently addressed what constitutes probable cause:

> "The rule of probable cause is a non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion." *Doering v. State,* 313 Md. 384, 403 [545 A.2d 1281] (1988). Probable cause exists where the facts and circumstances within the officer's knowledge and of which he had reasonably trustworthy information would justify the belief of a reasonable person that a crime has been or is being committed. *See Beck v. Ohio,* 379 U.S. 89, 91 [85 S.Ct. 223, 13 L.Ed.2d 142] (1964); *Collins* [*v. State,* 322 Md. 675, 680, 589 A.2d 479 (1991) ]. We have recognized that in dealing with probable cause, we deal with probabilities. "These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Doering,* 313 Md. at 403 [545 A.2d 1281] (quoting *Brinegar v. United States,* 338 U.S. 160, 175–76 [69 S.Ct. 1302, 93 L.Ed. 1879] (1949)).

*Stokeling v. State,* 189 Md.App. 653, 662, 985 A.2d 175 (2009) (quoting *Johnson v. State,* 356 Md. 498, 504–05, 740 A.2d 615 (1999)), *cert. denied,* 414 Md. 332, 995 A.2d 297 (2010). *Accord Maryland v. Pringle,* 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003); *Donaldson,* 416 Md. at 481, 7 A.3d 84.

In the present case, Detective Farrar observed a group of individuals, in a popular place to buy narcotics, "trying to flag down" vehicles, yelling "[w]e have the fat 20's," a term referring to a $20 amount of cocaine. He then observed Mr. Allen

engage in what appeared to be a drug sale, giving the driver of a truck that stopped several small objects after the driver gave him money. There is no dispute that the police had probable cause to believe a drug transaction was occurring. *See Donaldson,* 416 Md. at 487, 7 A.3d 84 (probable cause to arrest individual who exchanged unidentified item for money if totality of circumstances supports conclusion exchange involved unlawful substance).

Mr. Smith argues, however, that there was no evidence that he personally engaged in drug activity. To be sure, Detective Farrar could not specifically testify about Mr. Smith's activities. He did testify, however, that the "whole group," which included Mr. Smith, would "bum rush" the cars, and that Mr. Smith approached the truck with Mr. Allen when what appeared to be a drug transaction occurred. Given this specific activity by Mr. Smith, in a "popular place to buy narcotics," and given that Detective Farrar previously had arrested Mr. Smith for drug distribution on the same block, the police had probable cause to arrest Mr. Smith.[2]

## B. Search Incident to Lawful Arrest

Appellants contend that the searches the police conducted incident to arrest "were unlawful under the Fourth Amendment because they were unreasonable under the circumstances." Specifically, they argue that the police conducted strip searches that were highly invasive and demeaning and were not justified by exigent circumstances. Appellants assert that "the police failed to take any steps to protect [appellants'] privacy despite the public location, presence of individuals other than the searching officers, and lack of exigency."

---

**2.** Moreover, as the State notes, when Detective Wiman first approached and inquired whether Mr. Smith had any contraband, Mr. Smith responded that he had marijuana in his coat pocket. This response gave Detective Wiman an independent basis for probable cause to arrest Mr. Smith. *See Rawlings v. Kentucky,* 448 U.S. 98, 110–111, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (police had probable cause to arrest defendant when he admitted that a large quantity of drugs found in a woman's purse belonged to him).

The State contends that the searches of appellants incident to their arrests were reasonable. It characterizes the searches as "reach-in" searches, rather than strip searches, asserting that neither "their private body parts [n]or the buttocks area [were] publically exposed." The State further argues that, even if the searches were unreasonable, the "exclusionary rule should not be applied" because "the actions of the officers in this case [were] not the type of highly culpable conduct that the exclusionary rule is directed to deter." Finally, the State argues that "any error in denying the motion to suppress did not affect the verdict," asserting that, even without the evidence of the drugs seized, the facts set forth in the agreed statement of facts supported appellants' convictions for distribution of cocaine.

 It is clear that the police are allowed to conduct a search incident to an arrest to remove weapons or " 'to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.' " *Paulino v. State,* 399 Md. 341, 350, 924 A.2d 308, *cert. denied,* 552 U.S. 1071, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007) (quoting *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)). *Accord State v. Nieves,* 383 Md. 573, 585, 861 A.2d 62 (2004); *State v. Harding,* 196 Md.App. 384, 427, 9 A.3d 547 (2010). The question here is whether a strip search, or a "reach-in" search, is a reasonable search incident to arrest.

The United States Supreme Court has not addressed the reasonableness of a strip search incident to an arrest. *Nieves,* 383 Md. at 585, 861 A.2d 62; *Harding,* 196 Md.App. at 387, 9 A.3d 547. It has, however, addressed the reasonableness of a strip search in connection with pretrial detention. *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). In that context, the Court stated:

The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the

particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.*

The Court of Appeals and this Court have applied this analysis in addressing claims regarding the reasonableness of a strip search incident to arrest. *See Paulino,* 399 Md. at 359–60, 924 A.2d 308 (strip search and visual body cavity search unreasonable when conducted in a well-lit public car wash); *Nieves,* 383 Md. at 596, 861 A.2d 62 (strip search incident to arrest for a minor traffic violation unreasonable because the offense precipitating the arrest did not create reasonable suspicion that the defendant possessed weapons or drugs); *Harding,* 196 Md.App. at 435–46, 9 A.3d 547 (strip search incident to arrest for drug possession reasonable because the police had particularized suspicion that drugs would be found on the defendant's person). These cases make clear that a strip search is not the type of search that the police may conduct automatically incident to arrest; rather, the reasonableness of such a search is determined by consideration of the four-factor test set forth by the Supreme Court in *Bell. See Paulino,* 399 Md. at 355, 924 A.2d 308; *Nieves,* 383 Md. at 588, 861 A.2d 62; *Harding,* 196 Md.App. at 403–04, 9 A.3d 547.

The first issue we must address, therefore, is whether the searches here were strip searches. The State contends that they were not strip searches because the appellants' "clothing was not removed nor were any of their private body parts or the buttocks area publically exposed." It argues that the searches here were "reach-in" searches, a search defined as one that "involves a manipulation of the arrestee's clothes such that the police are able to reach in and retrieve the contraband without exposing the arrestee's private areas." *Paulino,* 399 Md. at 360 n. 6, 924 A.2d 308.

Appellants contend that the searches were strip searches, not "reach-in" searches, arguing that a "reach-in" search does not expose the arrestee's private area, and the police here

inspected appellants' bare buttocks during the searches. Appellants further argue that, regardless of how the searches are classified, they were unreasonable under the test set forth by the Supreme Court in *Bell*.

The dispute between the parties regarding whether the searches were "strip searches" is not surprising given the conflicting definitions of the term "strip search." *Compare Nieves*, 383 Md. at 586, 861 A.2d 62. ("In general, strip searches involve the *removal* of the arrestee's clothing for inspection of the under clothes and/or body.") (emphasis added), *with Paulino*, 399 Md. at 352–53, 924 A.2d 308 (defining a strip search as " 'any search of an individual requiring the *removal or rearrangement* of some or all clothing to permit the visual inspection of the skin surfaces of the genital areas, breasts, and/or buttocks' ") (quoting *Nieves*, 383 Md. at 586, 861 A.2d 62) (emphasis added). Indeed, courts in other jurisdictions have reached conflicting results regarding whether a "reach-in" search, where clothing is pulled away from the body but not removed, constitutes a strip search. *Compare United States v. Williams*, 477 F.3d 974, 976–77 (8th Cir.) ("reach-in" search of clothed subject less severe than a "full-blown strip search"), *cert. denied*, 552 U.S. 906, 128 S.Ct. 237, 169 L.Ed.2d 181 (2007), and *Jenkins v. State*, 978 So.2d 116, 126–28 (Fla.2008) (where police pulled boxer shorts away from defendant's waist to look for drugs and no body parts were exposed, search was not a strip search), *with State v. Jenkins*, 82 Conn.App. 111, 842 A.2d 1148, 1156, 1158 (2004) (characterizing a "reach-in" search as a type of strip search). *See also Harding*, 196 Md.App. at 412, 9 A.3d 547 ("reach-in" searches may "flitter back and forth" between "the far end of the routine search incident continuum" and "a strip search requiring some incremental justification").

In our view, whether a "reach-in" search is classified as a strip search is not dispositive. To be sure, a "reach-in" search may be less invasive than a search requiring a suspect to remove his or her clothing. To the extent that it allows an officer to view a person's private areas, however, it still is

intrusive and demeaning. *See State v. Stone,* 362 N.C. 50, 653 S.E.2d 414, 418 (2007) (search of intimate areas violates social expectations; "areas are referred to as 'private parts' for obvious reasons"). Accordingly, we hold that, regardless whether it is classified as a strip search, a "reach-in" search or other search inside a person's clothing, which permits the officer to view a suspect's private areas, is not the type of search that automatically is allowed as a search incident to arrest. Rather, the analysis for a strip search incident to arrest applies, and the reasonableness of a reach-in search is to be determined by reference to the four factors set forth by the Supreme Court in *Bell:* 1) the scope of the particular intrusion; 2) the manner in which it is conducted; 3) the justification for initiating it; and 4) the place in which it is conducted. 441 U.S. at 559, 99 S.Ct. 1861.[3]

Applying these factors to the present case, we hold that the searches were reasonable. Addressing first the justification for the search, the Maryland appellate courts have held that a strip search incident to arrest may be conducted only if there is reasonable suspicion to believe that drugs are concealed on the suspect's body. *Nieves,* 383 Md. at 596, 861 A.2d 62; *Harding,* 196 Md.App. at 438, 9 A.3d 547. We hold that the same justification is required for a "reach-in" search. *See Safford Unified School District # 1 v. Redding,* —— U.S. ——, 129 S.Ct. 2633, 2643, 174 L.Ed.2d 354 (2009) (school search that goes beyond "outer clothes and backpacks to exposure of intimate parts" requires reasonable suspicion that evidence concealed under clothing).

The State argues, and appellants do not dispute, that the police had justification for the searches, given that they were "incident to a lawful arrest for narcotics distribution, and it was reasonable for the police to believe that Mr. Allen and Mr. Smith were concealing drugs on their persons." We agree.

---

**3.** As explained, *infra,* to the extent that a "reach-in" search is less invasive than a strip search, the type of search will be relevant in assessing the first *Bell* factor, the scope of the intrusion.

As this Court recently noted, it is "well known in the law enforcement community, and probably to the public at large, that drug traffickers often secrete drugs in body cavities to avoid detection." *Moore v. State*, 195 Md.App. 695, 718, 7 A.3d 617 (2010). This knowledge supports our holding that, when a person is arrested for drug dealing, the nature of the offense provides reasonable suspicion to believe that the arrestee is concealing drugs on his or her person. *See United States v. Barnes*, 506 F.3d 58, 62 (1st Cir.2007) (strip search justified given arrest for drug trafficking crime); *State v. Jenkins*, 842 A.2d at 1151 (nature of offense of drug distribution provides reasonable suspicion to believe arrestee carrying contraband). *See also People v. Hall*, 10 N.Y.3d 303, 856 N.Y.S.2d 540, 886 N.E.2d 162, 166 (2008) (reasonable suspicion justifying visual body cavity search of arrestee may be found by consideration of " 'the crime charged, the particular characteristics of the arrestee, and/or the circumstances of the arrest' ") (quoting *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)), *cert. denied*, ―― U.S. ――, 129 S.Ct. 159, 172 L.Ed.2d 241 (2008).

We turn next to the other factors in the test, the scope, manner, and location of the search. Appellants contend that the searches here were unreasonable because they were "highly invasive and demeaning" and conducted "on a public street in a residential area," where "the officers took absolutely no precautions to protect their personal privacy."

Although a "reach-in" search that exposes a person's private area is invasive, and therefore not automatically permitted as a search incident to arrest, it is less invasive than a full strip search. Here, the police officers merely pulled the appellants' pants and underwear away from their waist, at which point the police observed a plastic bag protruding from the appellants' buttocks. Appellants' clothing was not removed, and the private areas of their bodies were not publicly exposed. The officers took steps to protect appellants' privacy. In each case, the officer involved testified, and the court credited the testimony, that the officer stood directly behind the suspect, and he was the only one who could see appellants' buttocks

during the search.[4] The scope and manner of the searches were not unreasonable.

With respect to the location of the searches, appellants note that they occurred on a public street. Although that is true, the testimony was that the searches were conducted out of public view. The officers testified that the searches occurred in front of storage garages, not homes, and there were "no civilians in the area."

A "reach-in" search may be reasonable under the Fourth Amendment, even if it occurs in a public place, if the police take steps to protect the suspect's privacy. *See Williams*, 477 F.3d at 977 ("reach-in" search of defendant's pants in police parking lot was reasonable where precautions were taken by the officers to prevent viewing by passersby); *United States v. McKissick*, 204 F.3d 1282, 1287, 1297 (10th Cir.2000) ("reach-in" search of defendant's pants in a hospital parking lot was reasonable); *Jenkins*, 842 A.2d at 1158 ("reach-in" search conducted on side of a restaurant out of public view was reasonable); *Jenkins v. State*, 978 So.2d at 127–28 ("reach-in" search reasonable where officer "merely pulled back" suspect's boxer shorts and no evidence civilian able to view suspect's buttocks); *People v. Butler*, 27 A.D.3d 365, 813 N.Y.S.2d 366, 369 (2006) ("reach-in" search, where the police briefly loosened and lowered the suspect's pants on a city street, was reasonable where buttocks were not exposed to public view because suspect wearing long t-shirt); *appeal dismissed*, 6 N.Y.3d 893, 817 N.Y.S.2d 628, 850 N.E.2d 675 (2006). As indicated, the testimony here was that the officers took precautions to protect appellants' privacy; the searches were conducted so that no one, other than the searching officer, could have observed appellants' buttocks.

---

**4.** Appellants assert in their reply brief that the officers' testimony that no one else could see their buttocks was not competent evidence pursuant to Maryland Rule 5–602 because they had no personal knowledge regarding what other eyewitnesses perceived during the searches. This argument was not raised below, and it is not raised as a ground of error on appeal. Accordingly, we will not address the issue.

Appellants rely on *Paulino,* 399 Md. at 361, 924 A.2d 308, in which the Court of Appeals held that a strip search in a public place was unreasonable. In particular, appellants note the Court's holding that such a search was unreasonable in the absence of exigent circumstances. *Id.* at 360, 924 A.2d 308. Appellants argue that "there were no exigent circumstances to justify such an extreme intrusion into [their] personal privacy."

As the State points out, the facts in *Paulino* were substantially different from the facts in this case. In *Paulino,* the police conducted a search in the bay of a car wash. *Id.* at 345, 924 A.2d 308. The search occurred after Mr. Paulino was removed from the car and placed prone on the ground. *Id.* at 346, 924 A.2d 308. According to police testimony, Mr. Paulino's pants "were already pretty much . . . below his butt." *Id.* One of the detectives then "put on a pair of gloves and just spread his cheeks apart a little bit and it was right there." *Id.* In *Paulino,* as in this case, there was no dispute regarding the justification for a search of the private area of a suspected drug dealer. Rather, the challenge concerned the scope and manner of the search in a public place.

With respect to the scope and manner of the search, the majority of the Court rejected the position taken by the dissent that this was a "reach-in" search, stating that "the police did not only lift up Paulino's shorts, but also the officers manipulated his buttocks to allow for a better view of his anal cavity." *Id.* at 353, 924 A.2d 308. Because the search in that case involved the "manipulation of the intimate parts of a suspect's person," *id.* at 354 n. 4, 924 A.2d 308, the Court held that the search was both a strip search and a visual body cavity search. *Id.* at 353–54, 924 A.2d 308.[5] It was the highly invasive nature of the search in *Paulino,* as well as the lack of evidence that Paulino's privacy was protected in any way, that

---

5. The Court stated that if the officers had seen the drugs "without spreading his buttocks cheeks," the classification of the search, *i.e.,* as a "reach-in" search as opposed to a strip search, "would be a close one." *Paulino v. State,* 399 Md. 341, 353–54, 924 A.2d 308, *cert. denied,* 552 U.S. 1071, 128 S.Ct. 709, 169 L.Ed.2d 571 (2007).

led the Court to hold that exigent circumstances were required before such a search in a public place was reasonable. *Id.* at 359–60, 924 A.2d 308. *See also Hall,* 856 N.Y.S.2d 540, 886 N.E.2d at 169 n. 8 ("except in the most extraordinary circumstances," a public visual body cavity search is "patently unreasonable").

In the present case, by contrast, the searches were not as highly invasive. As indicated, they were brief and conducted in a manner such that appellants' private areas were not publicly exposed. After balancing the four factors set forth in *Bell,* we hold that the searches in this case were reasonable under the Fourth Amendment.

**JUDGMENT OF THE CIRCUIT COURT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**